ROBERTS, DUNLAP & COMPANY, plaintiffs in error, *vs.* JAMES S. GRAYBILL, defendant in error.

1. If a case turn entirely on the question whether plaintiff or one of the defendants is to be believed, and if the jury believe the plaintiff, and if his version of the transaction sustain the legality and equity of the verdict, as well as the sufficiency of the evidence to support the verdict, this court will not control the discretion of the presiding judge in refusing a new trial on those grounds.

2. If defendant's theory of the case be true, that the transaction was a bailment and not a loan, and that the plaintiff agreed that if confederate money which he collected proved valueless at the end of the war, then the loss should be plaintiff's, it is not necessary that defendant should tender the money after the war closed; it is enough that he prove, in any way, that the money died on his hands; therefore a charge that a tender, after the war, had nothing to do with the case did not hurt the defendant, the charge being right in other respects.

3. A contract, whether for the loan or bailment of confederate currency, made on the 24th of December, 1864, is within the ordinance of 1865, authorizing the jury to settle equities between the parties, growing out of confederate contracts, and the charge that the case is within the ordinance, is right.

4. The charge that if the jury found for the plaintiff, they should be governed by Barber's tables, to be found in *34 Georgia Reports*, in estimating the amount due him in currency, did not hurt the defendants, said tables being in evidence without objection.

5. A new trial will not be granted on newly discovered evidence which pertains entirely to an agreement of counsel, not in writing, and which the original counsel of defendants neglected to communicate to his successors, and which they neglected to ascertain when he went upon the bench.

Evidence. Confederate money. Tender. Contracts. Charge of Court. New trial. Before Judge BARTLETT. Bibb Superior Court. October Term, 1875.

Reported in the opinion.

HILL & HARRIS, for plaintiffs in error.

T. J. SIMMONS; A. O. BACON, for defendant.

JACKSON, Judge.

Graybill brought an action of assumpsit founded upon a receipt which was as follows:

"Received from James S. Graybill three sight drafts, given by W. L. High, agent, for $20,000 00 each, making $60,000 00, signed by W. L. High, agent, to A. A. Bell, Augusta, Georgia. The drafts received for collection or return protested, and indorsed by James S. Graybill."

The petition alleged that Roberts, Dunlap & Company did collect the said sum of $60,000 00, and did convert the same to their own use, and thereby became liable to pay

said sum to the plaintiff; and in consideration of such liability undertook and promised to pay said $60,000 00 to the plaintiff, which, though requested, they had failed to do. The receipt was dated the 24th of December, 1864, and the collection, and conversion and promise to pay, were alleged to have occurred on the first of January, 1865. To this declaration the defendants pleaded the general issue; *non est factum* in this, that the instrument or receipt had a condition in it that the sum was collectible in Confederate treasury notes, which had been torn off, and that the promise was to pay in Confederate money, and not otherwise, and that on the 6th of May, 1865, the defendants tendered the plaintiff the sum due in Confederate notes, which was refused; which last plea was afterwards amended by setting out that they collected the money in January, 1865, in Confederate currency, and about the first of February thereafter offered to pay him, but he refused it, and requested them to hold it, giving them the right to use it as they pleased, and that they again tendered it on the said 6th of May, and plaintiff again refused to receive it, and it became worthless on defendants' hands. On this pleading plaintiff introduced the receipt, and testified that the receipt was correct and nothing had been torn off it, and that it had been altered in no particular whatever; that Roberts, on the 24th of December, 1864, came to him and inquired if he did not have money in Augusta; he replied he had the three drafts on Bell; that Roberts said that he would like to have it as he wanted to buy goods in Augusta, and he told Roberts that it was worth something to collect the funds in Augusta, and he would let him have the $60,000 00 at seven per cent. for one, two or three months. At the expiration of the time, three months, he thinks, he called at his store and wished to know if Roberts wanted the money longer; Roberts said he did, and would pay more than seven per cent. for it. Afterwards called on Roberts for $2,500 00, but he could only pay $1,-500 00; he had used the balance. Afterwards, he called on him for $50,000 00, telling Roberts that he could lend it at $1,000 00 a month to a good merchant in Macon. Roberts

said he could pay as much as anybody, and wanted to keep the money; plaintiff then told him that he could keep it. The drafts were never returned protested, and it was never denied that the money was collected by defendants. Some ten days or two weeks after the Confederacy had gone up, and Wilson was in possession of Macon, Roberts tendered him what he said was $60,000 00, which he had in a package; witness refused to take it.

Roberts, on the other hand, swore that the receipt was not a true copy, and that it had been altered by tearing off a copy of one of the drafts, which was at the top of the receipt, and expressed to be payable in Confederate treasury notes; that he went to Graybill, having learned that he had money to loan Graybill said he had none, but he had three sight drafts on Augusta for $20,000 00 each; that they took them to collect, and as Graybill was doubtful about their collection, he agreed that we should have the money for three or four months, without interest, in consideration that we charged nothing for collecting it; that no interest was to be paid, and the money was to be returned in Confederate currency. The money was collected in January, and Graybill was notified, and at various times between January and April, 1865, he was told that the money was ready for him; he said he did not want it, and that whenever he did he would call for it, and take it in Confederate notes. Witness warned him repeatedly that the war would end, and Confederate money might go up; he said if it did it would be his loss. Such was the contract, and he took the risk. About the 27th of March he called late in the evening to get $3,000 00. Witness told him he did not know that he had that much in the store, but let him have $1,500 00, which he said would do until morning, and in the morning he said he wanted no more; afterwards he said he wanted $2,500 00 to loan in Macon. Witness told him he could have it, but he changed his mind as it would not be safe; witness then told him that he had the money and was ready to pay it, but unless he wanted it witness would use it in their business. He said he didn't want it, and witness sent the money down to Bain-

Roberts, Dunlap & Company *vs.* Graybill.

bridge and Thomasville for investment, and it has been return-ed, and witness has on hand the original money—it was never invested. The money was again tendered to plaintiff in May, 1865, and he declined to receive it. On cross-examination, Roberts said that he did not remember whether he got the money tendered in May from John Curd or not; he had no recollection of it; that the money that he had sent to Bain-bridge and Thomasville had not then been returned.

Graybill, in rebuttal, swore that he never agreed in the con-tract that if Confederate money · became worthless by the end-ing of the war, that the loss should be his.

The jury found for the plaintiff $1,459 69, principal, and interest, payable in currency. The defendants moved for a new trial, because the verdict was contrary to law, to the prin-ciples of justice and equity, against the weight of the evidence and without evidence to support it. Because the court ruled that a tender made after the fall of the Confederacy had noth-ing to do with the case, and excluded the evidence of Jones to that effect. Because the verdict of the jury was contrary to the charge of the court, as follows: "If the jury believe from the evidence that the drafts were expressed to be payable in confederate currency, and the full amount of the debt at any time afterwards was unconditionally tendered to the plaintiff in Confederate money, this is a good tender." Because the court charged that this case falls under the ordinance of 1865, and because the court further charged that Barber's tables show the value in gold, and the jury will therefore ascertain the value of Confederate money at the time they shall fix upon, and so find, if their verdict shall be for the plaintiff. Another ground for a new trial was newly discovered evidence, which consisted of a deposition of Judge B. Hill, to the effect that he was the original counsel for the defendants, filed the plea of *non est factum*, and after filing it he had an interview with Judge Lochrane, who admitted the facts stated in the plea were correct, and showed deponent the copy draft that had been severed from the receipt, and admitted that the draft and re-ceipt were one and the same paper, and should be regarded as

one and produced together at the proper time; that deponent therefore took no steps to have the missing papers produced, and never informed Hill & Harris, nor any of the defendants of these facts, relying upon the agreement and supposing it would be carried out.

The court overruled the motion for a new trial, and defendants excepted.

1. In respect to the first grounds taken in the motion that the verdict is against the law, justice and equity, and the weight of the evidence, it is enough to say that if the plaintiff told the truth in his testimony the verdict is sustained abundantly by law, justice, and the evidence. The jury found that the plaintiff did tell the truth. The question for them was whether the plaintiff told it, or the defendant, Roberts; they had a right to believe the plaintiff; it was purely a question for them, and it is not for us to interfere and thus to take upon ourselves to say that Roberts was to be believed and that Graybill was not to be believed. The court below was satisfied with the finding, and this court has held so often that in such cases it will not interfere that it is unnecessary to reiterate the old story.

2. But in this case it is said that the court erred in holding that a tender made after the fall of the Confederacy, and when both parties knew that the Confederate currency tendered was utterly worthless, had nothing to do with the case. We cannot see why the tender should have been made. If plaintiff's account of the trade was correct, the tender was too late; it was utterly valueless, and no legal tender under the ordinance of 1865 or otherwise. If defendant's theory was right, then the tender was useless; all he had to do was to show that the money died on his hands; for, according to his theory, the plaintiff assumed all risk, and if the money became valueless, it was to be plaintiff's loss. There would be no sense in tendering a dead pawn or bailment—to prove its death on the trial would answer every purpose. To show the dead body, then, on the trial, would be but to show more conclusively that it had died; and if before, it had been tendered after

Roberts, Dunlap & Company *vs*. Graybill.

death a hundred times, it would not strengthen the proof of its worthlessness. We do not think that the verdict was contrary to the charge of the court in respect to tender.

3, 4. But it is said that the court erred in charging that the case fell within the ordinance of 1865. We think that it did fall within it. That ordinance was to settle equities between parties which grew out of contracts made during the war. This was made during the war. If it was to be paid for as a loan, according to plaintiff's version, it fell within the ordinance; if returned after the war as a bailment, it fell within the ordinance. In the first case, the equity was to scale it to its value in greenbacks; in the second case, it was to find for defendant. The court did not tell the jury to find either way, but simply to do equity, under the ordinance, which gave them full power to do right. If they found for the plaintiff, the court told them to be governed by Barber's tables, which were in evidence without objection. The jury found for the plaintiff in currency instead of gold, so that if this charge hurt anybody it hurt the plaintiff.

5. We think there is nothing on which we can grant a new trial in the newly discovered testimony. The agreement was between counsel and was not in writing. Besides, Judge Hill should have told his successors about the agreement, and they should have inquired all about their case of the original counsel who had gone on the bench. There was want of diligence all around. On the whole, we see no error of the court disclosed to us in this record which would authorize our interference, and the verdict is fully sustained by Graybill's testimony. If Mr. Roberts has been wronged, it seems to have grown out of the fact that his neighbors, the jury, believed the version of the plaintiff rather than that which he, Roberts, gave of the transaction.

Judgment affirmed.